UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Joanne Fratturo, *Plaintiff*, v. Gartner, Inc., *Defendant*. | Civil No. 3:11cv113 (JBA) January 15, 2013 |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On January 20, 2011, Plaintiff Joanne Fratturo filed a complaint [Doc. # 1] against her former employer, Defendant Gartner, Inc., alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(1),[1] arising out of Defendant's decision to eliminate Plaintiff's position and terminate her in January 2010. Defendant now moves [Doc. # 39] for summary judgment on all of Plaintiff's claims, arguing that Plaintiff has failed to establish a prima facie case of discrimination under the ADEA, the ADA, or the CFEPA, and has failed to establish that Defendant's legitimate nondiscriminatory reason for eliminating her position was pretextual. For the following reasons, Defendant's motion is denied.

---

[1] At oral argument, counsel for the parties agreed that Plaintiff's state–law claims are coextensive with her federal claims, and thus the Court will consider Plaintiff's federal and state claims under the same analysis. *See Craine v. Trinity College*, 259 Conn. 625, 637 n.6 (2002) ("We look to federal law for guidance on interpreting state employment discrimination law and the analysis is the same under both." (citing *State v. Comm'n on Human Rights & Opportunities*, 211 Conn. 464, 469–70 (1989)).

I.      **Factual Background**

A. **Plaintiff's Employment History at Gartner**

Plaintiff was hired by Defendant in August 2000, as a Coordinator, which is an administrative role.  (Fratturo Dep. at 189.)   In 2005, she was promoted to Senior Coordinator, and reported to Marisa Kopec, a Vice President in the Corporate Marketing Group.  (*Id.* at 189–90).[2]   In 2006, Kopec was transferred to the newly formed High Technology and Telecommunications Programs Group ("HTTP").   (Fratturo Dep. at 133.)  Plaintiff applied for and received a position as a Senior Coordinator in the HTTP Group, continuing to support Kopec.  (*Id.* at 133–34.)  However, the head of Corporate Marketing would not transfer Plaintiff until her prior position was filed, and she performed the duties of both positions for several months before Victoria Romanchuk, a younger individual, was hired for the HTTP role.[3]  (*Id.* at 134–39; Bedell Dep. at 66.)  In late 2007, the Corporate Marketing and Sales Operations Groups were combined under Marta Armida. (Fratturo Dep. at 134–39.)   At that time, Plaintiff was encouraged to transfer to a role overseen by Maria Cute supporting the Local Briefings Program in the Sales and Marketing Group, and was eventually moved to that position in April 2008. (*Id.* 145–46.)   The Local Briefings Program consisted of "live presentations by Gartner

---

[2] Ms. Fratturo states that she supported several vice presidents in Corporate Marketing in her role as Senior Coordinator.  (*See* Fratturo CHRO Aff., Ex. 7 to Pl.'s Loc. R. 56(a)2 Stmt [Doc. # 49] ¶ 6 ("In 2005 I began a new position as a Senior Coordinator with Corporate Marketing.  It was my job to support assigned Directors, Vice Presidents, Senior Vice Presidents and Group Vice Presidents.  These assignments varied over time, but were always in the Marketing Department.").)

[3] Defendant disputes this version of events, claiming that Plaintiff voluntarily requested that a new employee be hired to fill her role in HTTP.  Plaintiff admits that she made the decision to stay in marketing and move Victoria Romanchuk, a younger woman, to HTTP.  (*See* Fratturo Dep. at 139–40.)  However, Plaintiff did complain to the Human Resources Department that it was unfair to "hold [her] back" from the position in HTTP and require her to perform the duties of both positions. (*Id.* at 140–41.)

analysts to hundreds of clients and non–clients on relevant topics facing IT users and vendors." (Cute Decl. [Doc. # 42] ¶ 2.)[4]  Also incident to this restructuring, the new role of "Local Briefing Specialist" was created, and Cheryl Graham, Zelda Strong, and Monica Artega—all of whom are younger than Plaintiff—were transferred into that role. (Cute Dep. at 28–32, 36, 111–12.)

As a Senior Coordinator in Local Briefings, Plaintiff's duties included[5] assembling and photocopying marketing materials, filling out Xerox tickets, inserting attendee badges into folders, packing boxes, creating check–in lists for events, arranging for hotels for local briefings, processing Cute's travel expenses, and ordering supplies. (See Fratturo Dep. at 211–13.) On several occasions during 2008, Ms. Fratturo informed Cute that she felt she was best as the "setup person" and would prefer to remain behind the scenes rather than interfacing with clients. (See id. at 102–04; Cute Dep. at 115–16.)[6]

Beginning in mid–2007, Gartner increased its focus on conducting webinars as a part of a strategic marketing initiative. (Cute Dep. at 18.) These webinars are

---

[4] Defendant claims that Plaintiff transferred voluntarily and enthusiastically into Cute's group and that she told Cute that "she really felt good about the opportunity." (Ex. 3 to Lubochinski Decl. [Doc. # 45].) However, Plaintiff alleges that the transfer was not one of increased opportunity, but instead Armida brought in a much younger woman, Cindy Gillan, to take over Plaintiff's role in Marketing and sent Plaintiff to do Gillan's old job in Local Briefings. (See Fratturo Dep. at 150–54.)

[5] Defendant contends that Plaintiff's duties consisted entirely of providing administrative support of the type described above. (See id. at 211–13.) Plaintiff contests this characterization of her role, and asserts that she managed various other tasks as Senior Coordinator and made it known that she would like to expand her responsibilities. (See id. at 70–76, 145–47, 158–68.)

[6] Plaintiff contests Defendant's representation of these conversations with Cute, and claims that at the height of her illness in 2008, she was uncomfortable with face–to–face client contact due to the toll she felt her illness had taken on her appearance. (See id. at 98–99.) Ms. Fratturo contends that her conversations about remaining behind the scenes were based on her illness and that she was not refusing increased responsibility in her job. (See id.)

"presentations on IT developments conducted by Gartner analysts over the phone and internet to hundreds of clients and non–clients, including senior executives." (Cute Decl. ¶ 3.)  In 2008 or 2009, Cute asked Ms. Fratturo if she would like to learn how to conduct webinars, and Plaintiff declined.[7]  (Fratturo Dep. at 112.)  In order to accommodate the increased focus on webinars, Defendant hired several new, younger, employees to conduct webinars in 2009.  For example, Beatriz Nieves, a former independent contractor for Gartner, was hired as a Webinar Specialist (Cute Decl. ¶ 7), and Kim Small and Victoria Romanchuk were transferred to Cute's team from other departments as a Webinar Coordinator and a Project Manager, respectively  (Armida Dep. at 26, 72; Cute Decl. ¶¶ 6–7).  Plaintiff did not apply for, and was not considered for, any of these positions.  (Fratturo Dep. at 15–26; Cute Dep. at 48–49.)[8]  Cute stated that she did not consider Ms. Fratturo for either of these roles because she "didn't feel [Plaintiff] could handle it," and she "didn't have time to give [Plaintiff] another role." (Cute Dep. at 48.)

### C.    Plaintiff's Health

Plaintiff took disability leave from June 6, 2008 through July 31, 2008, and took additional sick leave to receive medical treatment at the end of 2008 and in 2009.  (Cute Dep. 86–88; Fratturo CHRO Aff., Ex. 7 to Pl.'s 56(a)2 Stmt ¶ 10; Exs. 14, 15 to Pl.'s 56(a)2 Stmt.)  In December 2008, Plaintiff was diagnosed with Chronic Obstructive Pulmonary

---

[7] Plaintiff states that she declined this opportunity based on her ill health in 2008, but that in 2009 she expressly asked to increase her involvement in webinars.  (*See id.* at 70–76.)

[8] Plaintiff claims that Small's role was never posted, but that around the time Small was transferred to Cute's team, Ms. Fratturo had a conversation with Cute about working on webinars in a role similar to the one that was created for Small.  (*See id.*) Plaintiff admitted that she was not applying for a particular position in Webinars during her conversation with Cute.  (*See id.* at 76.)  Cute denies that this conversation took place. (*See* Cute Dep. at 47–48.)

Disease ("COPD").  (Fratturo Dep. at 43–44.)  Cute was not aware of Ms. Fratturo's actual diagnosis, but she knew that Plaintiff had breathing problems.  Cute and Ms. Fratturo discussed Plaintiff's health, and Cute mentioned her father–in–law's breathing problems resulting from emphysema during these discussions.  (Cute Dep. at 90–93.) Armida also was not aware that Plaintiff had been diagnosed with COPD.  (Armida Dep. at 39–40.)  However, Plaintiff's difficult breathing was readily visible at work:[9]

> Well, when I would—if I did have to go to a meeting, there would be walking involved and when I got there I may have been a little out of breath and needed to pause and breathe and pace myself and bring myself down to normal to be able to hold a conversation.  When you're out of breath, your words are choppy, so I had kind of lost weight and was very pale.  So in looking at me, I didn't look like the Joanne maybe in 2008.  I had lost some weight and I was a little bit paler, and my eyes seemed to be a little bit redder, reaction to medications and stuff.

(Fratturo Dep. at 45.)  Co–workers commented to Ms. Fratturo about her breathing difficulty (*id.* at 64–65), and Cute instructed the younger members of her team to ask if Plaintiff needed assistance, which Plaintiff thought was because of her health problems (*id.* at 61–64).

When Ms. Fratturo returned to work from her disability leave, she asked Cute for permission to leave early on certain days for medical appointments and therapy, and occasionally when she was not feeling well; Cute always granted her requests.  (*Id.* at 50–

---

[9] Plaintiff claims that because her breathing problems were readily apparent, Armida could have observed the effects of her illness.  (*See* Fratturo Dep. at 39–40, 45–46.)  Plaintiff also believed that Armida was aware of her health condition based on a specific interaction with Armida in which Armida looked at her in a certain way.  (*Id.* at 46–49 ("Q:  Are you saying that there was some time that she looked at you in a way that you thought was a—looked a certain way because of your health condition?  A:  Yes. . . . Q:  Okay.  And was there a look that you can describe that she gave that you thought was because of your medical condition?  . . . A:  Just as I was talking with her, I could just perceive in her eyes, but then that's my interpretation of her face.").)

53.)  Other than these requests for leave, and occasional requests for help with heavy packages, which Cute accommodated, Plaintiff did not ask to be moved to a job with different physical requirements because of her illness.  (*Id.* at 50–52, 57–58, 73–75.)[10] During Plaintiff's absence, other members of Cute's team "chip[ed] in" to cover Plaintiff's role (Cute Dep. at 77), and Plaintiff "would come in after hours and weekends to meet [her] deadlines" (Ex. 20 to Pl.'s 56(a)2 Stmt; *see also* Cute Dep. at 93).

### D.    The Elimination of Plaintiff's Position and Plaintiff's Termination

In late 2009, Armida received her 2010 management objectives, which included hiring an E–mail Producer to assist in the transition to a new customer relationship management software, and a Vice President of Webinars.[11]  (Armida Decl. [Doc. # 43] at ¶¶ 2, 4.)    Armida determined that she would need to eliminate a position in her department in order to hire a new employee.[12]  (Armida Decl. ¶ 3.)  Thus, Armida met with Michele Gaeta–Stolz, a human resources representative, to discuss strategies for locating room in Armida's budget for the new roles.  (Gaeta–Stolz Dep. at 39–41.)

---

[10] Plaintiff argues that she asked to become more involved in webinars in the fall of 2009, and "it was clear that this would have alleviated the physical shipping tasks she was performing."  (Pl.'s 56(a)2 Stmt at 11.)    However, she admits that she did not mention her COPD as a reason for requesting the transfer.  (Fratturo Dep. at 73–75.)

[11] Plaintiff points out that there is no written document evidence, aside from Armida's testimony, of these objectives.  Furthermore, Cute testified that she was not aware of the desire to hire an E–mail Producer, and that she had intended for Plaintiff to implement the new customer relationship management software.  (Cute Dep. at 137–38, 145–46.)

[12] Plaintiff disputes Armida's contention that she was required to eliminate a position in order to fill the E–mail Producer role because she needed to keep the headcount in her department flat.  Armida's headcount actually increased by one in 2010, and the proposed 2010 budget documents she prepared in 2009 note her intention to increase headcount.  (Ex. 34 to Pl.'s 56(a)2 Stmt at G00875.)  Plaintiff points to the fact that when Cute hired Nieves as a Webinar Specialist, she was able to make a business case for additional budget and head count in order to fill the position.  (Cute Dep. at 58.)

Armida quickly focused on Local Briefings when attempting to identify a role to eliminate without looking "in a lot of details" at any other departments because Local Briefings "wasn't popular with top management." (Armida Dep. at 34.)  Armida said she chose to eliminate Ms. Fratturo's role in Local Briefings because "her role was the only role in the organization that was supporting a department, rather than managing a project" (*id.* at 39), and in identifying which position to eliminate, she "didn't look at people's abilities and skills," but instead considered "the role they were performing" (*id.* at 35).  However, Armida never read Plaintiff's formal "role profile" before deciding to eliminate her position (*id.* at 36), and only after Armida made the decision to eliminate Ms. Fratturo's position, did Armida get a description of Plaintiff's responsibilities from Cute (*see* Ex. 20 to Pl.'s 56(a)2 Stmt at G00438), which Suzanne Bedell, a Senior Director of Marketing, said confirmed the logic of the choice to her (*see* Bedell Dep. at 35 ("[After reading this description] it made complete business sense as to why the role was being eliminated.")).  Armida did not consult with Ms. Fratturo's direct supervisor, Maria Cute, in reaching this decision.  (Cute Dep. at 120–21.)  When Cute was informed that Plaintiff's role was being eliminated she told Armida and Bedell:  "I need someone for the role there is no doubt about it and the thought of losing this headcount is very scary."  (Ex. 8 to Lubochinski Decl. [Doc. # 45] at G00644.)

On December 1, 2009, Christine Furano informed Armida and Bedell that "the urgency of having [the E-mail Producer] resource ha[d] recently intensified due to staffing shortages on [her] team." (*Id.*)  On December 3, 2009, Armida advised Cute and Bedell that "we now have all approvals we need to execute on the plan of eliminating [Plaintiff's] role." (Ex. 9 to Lubochinski Decl. at G00647.)  Cute suggested that they "offer [Plaintiff] less money or part–time—30 hours per week," rather than eliminating her

position entirely.  (*Id.*)  Cute cautioned Armida that "[Plaintiff] is having health issues

and is over 55.  Will we have any discrimination issues with HR on eliminating her role?"

(*Id.*)  Armida did not respond to Cute's concerns regarding Plaintiff's membership in

these protected classes (Armida Dep. at 60–61), and never contacted the legal

department[13] to consider whether there were legal problems with her decision to

eliminate Plaintiff's position (*id.* at 42–43).   In response to Cute's statements that

someone would then be needed someone to replace Ms. Fratturo in her department,

Bedell stated that "[Plaintiff's] responsibilities appear to be heavily administrative, which

I have to say, can and will have to be moved to individuals across the team.  The role is

being eliminated, which means hiring a new person to train is not going to be an option."

(Ex. 20 to Pl.'s 56(a)2 Stmt at G00439–40.)

   In discussing the procedure for informing Plaintiff of her termination, Gaeta–

Stolz recommended that "the meeting be held with [Armida] and I [sic] informing the

affected associate.  I think this will serve to reinforce that this was a business decision

based strictly on headcount vs [sic] anything to do with this associate's performance."

(*Id.* at G00437.)   Later that day, Cute again warned Armida, Bedell, and Gaeta–Stolz

about the possible appearance of discrimination:

> One last thing and I am sure this has been discussed with Legal etc.  Do we
> have any liability because of her age?  She also has been ill over the past
> year.  It hasn't affected her work performance; however I wanted to make
> sure you were aware so we do not have any issues.  She is a smoker and she
> goes to the Tully Center for therapy twice a week.  She also has stomach
> problems and her doctors haven't been able to figure out what is wrong.

---

[13] It does appear that Gaeta–Stolz ran "all appropriate checks with legal" in
preparation for eliminating Plaintiff's position.  (*See* Ex. 7 to Lubochinski Decl. at
G00404.)

(Ex. 29 to Pl.'s 56(a)2 Stmt at G00395.)  Armida's response was:  "And you are saying that this isn't affecting her performance?  How can it be . . ."  (*Id.*)  Upon reading this exchange, Gaeta–Stolz admonished Armida, Cute, and Bedell to "refrain from corresponding via e-mail re:  the sensitive items below.  If we need to have a conversation, please let me know."  (*Id.*)  Subsequently, Bedell, Gaeta–Stolz, Armida, and Cute met to discuss the elimination of Plaintiff's role, but none of the individuals at the meeting can recall exactly when the meeting was held or what was discussed.  (Cute Dep. at 149–53; Gaeta–Stolz Dep. at 92–93; Armida Dep. at 40–41.)

On January 14, 2010, Gaeta–Stolz, Cute, and Armida met with Plaintiff to inform her that her position was being eliminated.  (Fratturo Dep. at 9.)  Gaeta–Stolz informed Plaintiff that her role had been eliminated as part of a reduction in force.  (*See* Ex. 22 to Pl.'s 56(a)2 Stmt at G00563.)  However, Gaeta–Stolz later admitted that there was no reduction in force in January 2010.  (*See* Gaeta–Stolz Dep. at 82).  Plaintiff was told that she could reapply for any open positions at Gartner within three months and she would be reinstated.  (*Id.*)  Ms. Fratturo asked if there were any open positions she could be transferred to, and even offered to work cleaning the bathrooms, but was told that there was nothing available.  (*Id.* at 10–11.)  Plaintiff checked the Gartner website in January and February of 2010 and saw no suitable open positions.  (*Id.* at 11–12.)  Gaeta–Stolz also checked if there were any positions available, but determined that there were no open positions that would "be a fit" for Plaintiff, and advised Armida and Cute not to get Plaintiff's "hopes up" regarding future employment at Gartner.  (Ex. 23 to Pl.'s 56(a)2 Stmt at G00516.)  Armida spoke with the head of Gartner's Research Department about open administrative postings for Plaintiff, but there were none available.  (Armida Dep. at 71.)  Sometime after February 2010 Plaintiff did see an open position listed at Gartner,

but did not apply because "it hurt too much. It was emotional." (Fratturo Dep. at 12–13.) After Plaintiff was terminated, the majority of her responsibilities were outsourced to Xerox, and the remaining duties were assumed by other members of the Marketing Department, all of whom were younger than Plaintiff. (Ex. 11 to Lubochinski Decl. at 9.) At the time of Plaintiff's termination, Gartner was self–insured and was looking for ways to reduce insurance costs, noting that "chronic conditions account for 65% of our overall claims." (Ex. 32 to Pl.'s 56(a)2 Stmt at G01538.) Fratturo was fifty–eight years old and had a chronic health condition when she was terminated. (Fratturo CHRO Aff., Ex. 7 to Pl.'s 56(a)2 Stmt ¶ 3.)

On the same day that Plaintiff was terminated, Carolyn Shuler, a Briefing Specialist in the Marketing Department, was also told that her position had been eliminated in order to create a Vice President of Webinars position. (Shuler Decl. [Doc. # 44] ¶ 2.) She and Plaintiff were the only Gartner associates whose positions were eliminated. Shuler, who is younger than Plaintiff, was also given the opportunity to apply for a new position at her termination meeting. (*Id.*) Shuler applied for an open position as a Vendor Briefing Specialist in February 2010, and was rehired into the Research Department in April 2010. (*Id.* ¶ 3.)

II.    Discussion[14]

Plaintiff claims that Defendant discriminated against her based on her age and disability by eliminating her position and thus her employment with Gartner.  Defendant seeks summary judgment on all of Plaintiff's claims because they "are based entirely on speculation and unsupported subjective impressions."  (Def.'s Mem. Supp. [Doc. # 40]. at 1.)  Plaintiff counters that there are sufficient facts for a jury to find in her favor on each of her claims.

As a preliminary matter, Defendant argues that Plaintiff may not rely on evidence of events, conduct, or knowledge occurring more than 300 days before she filed her charges with the EEOC and the CHRO.  (*See id.* at 2 n.2; Def.'s Reply [Doc. #50] at 7.)  Plaintiff correctly maintains that she may rely on background evidence from before the 300–day administrative statute of limitations period to support her claim, which was timely filed.  (*See* Pl.'s Opp'n [Doc. # 46] at 10.)

> The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  Nor does

---

[14] "Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *see also Coger v. Connecticut Dept. of Public Safety*, 143 F. App'x 372, 374 (2d Cir. 2005) ("Plaintiff argues, and we agree, that *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), requires the consideration of facts, related to claims now untimely, as background to timely claims."); *Kitchens v. U.S. Postal Service*, 3:05-cv-195 (JCH), 2007 WL 1186077, at * 3 (D. Conn. Apr. 19, 2007) ("[T]ime–barred conduct may still be offered as evidence of discriminatory intent to support timely claims." (internal citations omitted)). Defendant's one authority, decided fifteen years before *Morgan* and addressing equitable tolling of the 300–day statute of limitations, is unpersuasive. *See Wingfield v. United Technologies Corp.*, 678 F. Supp. 973, 983 (D. Conn. 1988). Therefore, the Court will consider Plaintiff's proffered evidence relating to the time period before Plaintiff's timely–filed claims as background evidence if reasonably probative of timely, independent discrimination claims.

### A.    Age Discrimination Claims[15]

"In order to establish a prima facie case of age discrimination, [a plaintiff] must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010).   Once the plaintiff has established a prima facie case, "the burden shifts to the defendant to articulate 'some legitimate,

---

[15] At oral argument, Plaintiff's counsel clarified that Plaintiff's ADEA claims related only to her termination, and not to Defendant's failure to hire her for positions in the webinar group.

nondiscriminatory reason' for its action." *Id.* at 106 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  "Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination." *Id.*  "'A plaintiff bringing a disparate–treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but–for" cause of the challenged adverse employment action' and not just a contributing or motivating factor." *Id.* (quoting *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009)).  However, a plaintiff is permitted to advance an "age–plus" argument, to claim that she was discriminated against based on her membership in two protected classes.  *Id.* at 109 ("[W]e have recognized that a plaintiff's discrimination claims may not be defeated on a motion for summary judgment based merely on the fact that certain members of a protected class are not subject to discrimination, while another subset is discriminated against based on a protected characteristic shared by both subsets. And, as other courts have explained, where two bases of discrimination exist, the two grounds cannot be neatly reduced to distinct components." (internal citations omitted)).

### 1.     Prima Facie Case

Defendant argues that Plaintiff fails to establish a prima facie of age discrimination based on her termination in that she cannot establish the fourth prong— i.e., that her termination took place under circumstances giving rise to an inference of discrimination. [16]  (*See* Def.'s Mem. Supp. at 21.)  Defendant claims that Plaintiff cannot prove that Armida knew Plaintiff's age when she made the decision to eliminate her position, and that the sole basis for Plaintiff's discrimination claim is that she thought she

---

[16] At oral argument, Defendant advised that it does not dispute the first three prongs of Plaintiff's prima facie case of age discrimination.

looked old.  (*See* Fratturo Dep. at 77, 86 ("[D]ifferent people look different at different ages.  There are some very young 60–year–olds looking [sic], and there are some people who at 60 look 80.  And in that past year the health took its toll in my—I looked older . . . .  [W]hen I looked in the mirror, I looked old and thin and pale.  I did not look like Joanne who extruded [sic] confidence and—so if that's what I was seeing, it's possible that that's what they might have been seeing.  So I don't know because it's thoughts and feelings.  It's not fact.").)

As Defendant points out, "beliefs or feelings, however sincerely held, cannot support an employee's claim of discrimination if there is no proof or insufficient proof that the employer actually engaged in illegal discrimination; and unsupported subjective impressions are not probative on that issue."  *See Jackson v. Post Univ., Inc.*, 836 F. Supp. 2d 65, 98 (D. Conn. 2011) (finding that the plaintiff's "gut feeling" that he was terminated based on racial animus was insufficient evidence to establish discrimination).  While Plaintiff proffers no evidence that Armida knew her exact age when she informed Cute that Plaintiff's role was being eliminated, the evidence shows that Armida had reason to believe that Plaintiff was an older employee because Plaintiff's observation she had aged and lost weight as a result of her illness is objectively discernable, not just an "unsupported subjective impression."  The combined physical toll of her age and illness was apparent to her co–workers, and would have been to Armida, whom she occasionally passed in the hallways.  (*See, e.g.*, Romanchuk Dep. at 15 ("Q:  And it was pretty apparent from seeing her that she was having a rough time physically, right?  She lost a lot of weight?  A:  Yeah, [s]he did."); Fratturo Dep. at 66 ("Q:  What is your understanding of why Gartner terminated your employment?  What was the reason?  A:  I believe it was age discrimination and because of my health I wasn't a model cutting edge IT person

14

anymore, or— Q: Any other reasons? Sorry.  A: I guess the age.  I looked my age, and the health had taken a toll and I looked my age.").)  It is undisputed that when Armida informed Cute of her decision to eliminate Plaintiff's role, Cute twice expressed her concerns that the termination could appear discriminatory because Plaintiff was over 55. (*See* Ex. 9 to Lubochinski Decl. at G00647; Ex. 29 to Pl.'s 56(a)2 Stmt at G00395.)  As an alternative to termination, Cute requested that Plaintiff's salary be reduced or that she be asked to work part time because Plaintiff performed tasks "we don't know how to do." (Cute Dep. at 130–31.)  However, Armida rejected these alternatives and confirmed her decision to terminate Plaintiff knowing that Plaintiff was in a protected age group and without responding to Cute's concerns about the appearance of discrimination.  In fact, after reading Cute's description of Plaintiff's age and health issues, Armida commented: "And you are saying that this isn't affecting her performance?  How can it be . . ."  (Ex. 29 to Pl.'s 56(a)2 Stmt at G00395.)

Plaintiff has also presented evidence that some of her duties were reassigned to younger co–workers when she was terminated. (*See* Fratturo Dep. at 91–92; Ex. 11 to Lubochinski Decl. at 8–9.)  In some cases, such evidence may be sufficient to establish a prima facie case of age discrimination.  *See, e.g., Burger v. New York Inst. of Technology*, 94 F.3d 830, 834–35 (2d Cir. 1996) (evidence that a substantial portion of the plaintiff's duties were transferred to younger employees was sufficient to survive a motion for judgment as a matter of law in an ADEA action).  However, in each of the cases cited by Plaintiff, the majority of an individual's responsibilities had been transferred to a younger employee.  Here, the majority of Plaintiff's responsibilities were outsourced to Xerox, and her remaining duties were spread across the rest of Cute's team.  (*See* Ex. 11 to Lubochinski Decl. at 8–9.)  Nevertheless, the employees who took over the remaining

portion of Plaintiff's job duties were all at least ten years younger than Plaintiff (*see id.*), and thus while this evidence is weak, it hints of age bias. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000) ("Generally, a plaintiff's replacement by a significantly younger person is evidence of age discrimination.").

Plaintiff also claims that she was treated differently than Shuler, the younger employee laid off at the same time to make room for a new position in Armida's department, but rehired three months later.   When Plaintiff was first told of her termination, she made clear her willingness to transfer anywhere and do anything to avoid termination, but was told there were no available positions.   Defendant distinguishes Shuler's circumstances because, unlike Plaintiff, she applied for an open position that was posted, and consequently was rehired.[17]   Plaintiff does not dispute that she never applied for a position at Gartner after she was terminated.   Therefore, in the absence of evidence of deferential re–hiring treatment or process used with Shuler, this evidence does not support an inference of discrimination.   However, considering together all the circumstances, including Shuler's re–hire after the elimination of her position, the fact that younger employees took over Plaintiff's remaining duties, Armida's disregard of Plaintiff's responsibilities and performance in selecting her role for elimination, and Armida's response regarding the effect of Plaintiff's age and illness on her job

---

[17] Plaintiff claims, without any record support, that, unlike herself, Shuler was encouraged to reapply and had been reassigned at Gartner by virtue of job elimination several times.   (*See* Pl.'s 56(a)2 Stmt at 23.)   However, Plaintiff does present evidence which she argues could support a jury conclusion that Gartner had a history of marginalizing her for younger employees, first when she was not moved into her new position supporting Kopec and second when she was transferred to Cute's team to take over the position of a younger employee who had replaced her in her role supporting Armida.   (*See* Fratturo Dep. at 139–40, 150–54.)   The weight to be given to this evidence depends on consideration of the totality of the circumstances.

performance, a jury could infer that her termination was based on her age plus her disability.

### 2.   Legitimate Non–Discriminatory Reason

Defendant articulates a legitimate business reason for eliminating Plaintiff's role. Armida was tasked with filling the role of E–mail Producer in her department, and determined that to do so she would need to eliminate a position to keep headcount flat. Plaintiff does not dispute that such a budgetary justification meets Defendant's burden to state a legitimate, nondiscriminatory reason for its decision. Therefore, the burden shifts back to Plaintiff to show that Defendant's proffered reason for her termination was pretextual.

### 3.   Pretext

Defendant claims that Plaintiff cannot establish that its headcount justification is false because Plaintiff's role was not the only position eliminated in order to create a new opening in Armida's department. In rebuttal to Armida's claim that she needed to eliminate headcount, and Plaintiff, in order to fill the E–mail Producer and Vice President of Webinar roles, Plaintiff points to evidence that Cute was able to make a business case for increasing the headcount in the webinar group when she hired Nieves. (*See* Def.'s Reply at 2; Def.'s Mem. Supp. at 5–6.) In addition, Armida's budget presentations for her department in 2010 indicated a projected increase in headcount. (*See* Ex. 34 to Pl.'s 56(a)2 Stmt at G00875.) Further, when Plaintiff was terminated, Gaeta–Stolz informed her that her role had been eliminated as part of a reduction in force (*see* Ex. 22 to Pl.'s 56(a)2 Stmt at G00563), but later admitted that there was no reduction in force in January 2010 (*see* Gaeta–Stolz Dep. at 82). Thus, a reasonable juror could infer that because Armida could have made a business case for increasing headcount for the E–

mail Producer position, and there was no reduction in force, Defendant's stated reason for terminating Plaintiff was false.

Plaintiff also contends that the manner in which Armida selected her position for elimination evidences discriminatory intent. Plaintiff was the second oldest employee in Armida's group and the only one who was permanently terminated. (*See* Ex. 30 to Pl.'s 56(a)2 Stmt at 0069.) Other members of the Human Resources team confirmed that there was no discussion of eliminating any other employee's role in order to fill the E-mail Producer position. (*See* Gaeta–Stolz Dep. at 49–50.) Though Armida claimed that she selected Plaintiff's role for elimination because of the unpopularity of Local Briefings with upper management and because Plaintiff was the only employee in that department who performed a solely support role, she admitted that she never read Plaintiff's formal role profile to compare her position to that of other employees (*see* Armida Dep. at 36), and did not consult with Plaintiff's direct supervisor Cute to evaluate Plaintiff's role until after she made the decision to eliminate Plaintiff's position (*see* Cute Dep. at 120–21). Armida also admitted that she did not consult employee rankings and did not compare Plaintiff's role with similar roles when deciding which position to eliminate. (*See* Armida Dep. at 32, 37–38.)

At oral argument, counsel for Defendant argued that Armida had sufficient familiarity with Plaintiff's role to be able to evaluate the business case for eliminating Plaintiff's position based on her frequent discussions with Cute regarding personnel issues. Plaintiff contends that she had been moved out of her old role and into this disfavored group by Armida and replaced by a younger employee, and that once placed in the disfavored local briefings group, she was further marginalized by being excluded from webinar programming while younger employees were selected for these growth roles. In

sum, Plaintiff argues that she was first selected for a disfavored role, while younger employees were selected for advancement, and then was identified for termination.

Because Armida was the sole decision-maker in Plaintiff's termination, the credibility of her explanation as to the reasons and process she used for selecting Plaintiff's role for elimination is necessarily central to the issue of pretext. The evidence of inconsistencies in her headcount restructuring and the arbitrary nature of her decision-making raise credibility issues which should be considered by a jury at trial, rather than weighed by the Court at summary judgment, as it is at least minimally sufficient to permit a jury to infer that Defendant's proffered reasons for the elimination of Plaintiff's position were not true, and that age was the but-for cause of her termination. Defendant's motion for summary judgment is therefore denied as to Plaintiff's claims under the ADEA and the CFEPA.

### B.   Disability Discrimination Claims[18]

Plaintiff's disability discrimination claims are subject to the same *McDonnell Douglas* burden-shifting analysis as her age discrimination claims, but she must show only that her disability was a factor that made a difference in the decision to eliminate her position. *See Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc.* 198 F.3d 68, 72 (2d Cir. 1998) ("In analyzing a discriminatory discharge claim under the ADA, we apply the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."). To establish a prima facie case of disability discrimination under the ADA, Plaintiff must establish that:  (1) her employer is subject to the ADA; (2) she was disabled

---

[18] At oral argument Plaintiff withdrew her failure to accommodate claims related to Defendant's failure to hire her for a position in the webinar group.

within the meaning of the ADA; (3) she was "otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation;" and (4) she suffered an adverse employment action as a result of her disability.  *See Jacques v. DiMarzio*, 386 F.3d 192, 198 (2d Cir. 2004).  Once Plaintiff has established a prima facie case, the burden shifts to Defendant to "articulate some legitimate, nondiscriminatory reason" for Plaintiff's termination.  *McDonnell Douglas*, 411 U.S. at 802.  Once such a reason has been established, the burden shifts back to Plaintiff to show that Defendant's proffered reason was a pretext for prohibited disability discrimination.  *Id.* at 804.

> 1.  *Prima Facie Case*

Defendant claims that Plaintiff has failed to meet her burden to establish a prima facie case of disability discrimination as a result of her termination because she "cannot establish any inference of discrimination in connection with the alleged employment actions."[19]  (*See* Def.'s Mem. Supp. at 26.)  Defendant argues that Armida was not aware of Plaintiff's illness when she made the decision to eliminate Plaintiff's position.  However, as discussed above, there is evidence that Plaintiff's illness had taken an observable physical toll, and Plaintiff was frequently out of breath after walking to the team meetings that Armida attended. (*See* Fratturo Dep. at 39–43, 45.)  Thus reasonable jurors could conclude that Armida was in a position to observe the deterioration in Plaintiff's physical appearance and the effects of Plaintiff's breathing disorder at the time of her decision to eliminate Plaintiff's position.

Further, it is undisputed that Armida was advised of Plaintiff's health issues after she told Cute of her decision to terminate Plaintiff, and Cute twice expressed concern to

---

[19] Defendant confirmed at oral argument that it did not contest the first three prongs of Plaintiff's prima facie case of disability discrimination.

Armida that given Plaintiff's age and medical condition, the termination might appear discriminatory.  As noted above, Armida's reaction to Cute's explanation that Plaintiff's illness was not affecting her job performance was incredulous (*see* Ex. 20 to Pl.'s 56(a)2 Stmt at G00436), and at trial, jurors could consider this comment as part of the totality of the circumstances to reject Defendant's proffered reason for termination and could conclude that this comment was significant in light of Gaeta–Stolz's subsequent admonishment to Armida:  "I need to ask that we refrain from corresponding via e–mail re:  the sensitive items below," and instead  meet in person to discuss the termination. (Ex. 29 to Pl.'s 56(a)2 Stmt at G00395.)

Defendant tries to innoculate this as a "statement [that] alluded to plaintiff's absences, not her health condition" (*see* Def.'s Mem. Supp. at 27).  While this difference may be successful with a jury, distinguishing between the effects of disability leave versus the effects of a disability is not the only reasonable inference to be drawn from the statement of the sole decision maker.  As the Second Circuit has recognized:  "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007).  Here, the comment suggesting a relationship between Plaintiff's illness and her performance, made by the sole decision–maker during a discussion of the decision to eliminate Plaintiff's role could be sufficient to permit a jury to infer that Plaintiff's health condition played a role in her termination.

2.  *Pretext*

Defendant argues that Plaintiff has not presented sufficient evidence to overcome its proffered legitimate nondiscriminatory reason for the elimination of her position.

Defendant cites to *Buotote v. Illinois Tool Works, Inc.*, 815 F. Supp. 2d 549 (D. Conn. 2011), in support of its argument that Armida's comment is insufficient evidence of pretext for Plaintiff's disability discrimination claims to survive summary judgment.  In *Butote*, the manager's comments that the plaintiff was "'out of work more often than [he was] in work' such that 'his luck should change,'" were insufficient to show that his employer's proffered reason for his termination was pretextual.  *Butote*, 815 F. Supp. 2d at 559.  This Court stated that "even if those statements evince discriminatory animus, a reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false and that discrimination was the real reason."  *Id.* (quoting *Sanchez v. Connecticut Natural Gas Co.*, 421 F. App'x 33 (2d Cir. 2011)) (internal quotation marks omitted).   Mr. Buotote was found to have not proffered evidence that the employer's stated reasons for the plaintiff's termination were false such that the comment could show discriminatory animus to be the real reason for the termination, where the defendant had undisputedly undergone two major rounds of layoffs in compliance with its policy to make termination decisions based on seniority and the plaintiff was terminated in lieu of laying off a more senior employee.  *See id.*

In this case, however, Plaintiff has produced sufficient evidence for a jury to infer both that Defendant's stated reason for Plaintiff's termination was not to be credited, and that her disability was a motivating factor in the decision to eliminate her position.  Although Defendant's managers could and did make a business case to increase headcount when filling a position, Armida never did so when adding the E–mail Producer position (*see* Cute Dep. at 158), and had prepared budget presentations with increased headcount in her department for 2010, the year Plaintiff was terminated (*see* Ex. 34 to Pl.'s 56(a)2 Stmt at G00875).  While not overwhelming, when considered with

evidence of Armida's arbitrary decision–making process, her claim, or her reason for her claim, that she could not fill the E–mail Producer position without eliminating another position and maintaining a neutral headcount, is put in genuine dispute.   As with Plaintiff's ADEA claim, Armida's credibility as the sole decision maker is central to Plaintiff's ADA discrimination claims, and questions of credibility are appropriately the province of the jury.

Finally, the jury will consider the evidence that Gartner was self–insured, and at the time of the decision to eliminate Plaintiff's position, Gartner was looking for methods to reduce insurance costs, knowing that "chronic conditions [like Plaintiff's COPD] account for 65% of our overall claims." (Ex. 32 to Pl.'s 56(a)2 Stmt at G01538.)  Based on the lack of a defined decision making process for eliminating Plaintiff's role, Armida's negative comments regarding Plaintiff's health and age, and Gartner's admitted desire to reduce health insurance costs arising from chronic illnesses, there is sufficient evidence from which a jury could infer that anti–disability animus was a motivating factor in the decision to terminate Plaintiff.

## III.   Conclusion

For the reasons discussed above, Defendant's Motion for Summary Judgment [Doc. # 39] is DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 15th day of January, 2013.